THE QUEEN OF THE PACIFIC, HER CARGO, ETC.

*(Circuit Court, D. Oregon.   October 9, 1885.)*

1. SALVAGE—AMOUNT OF AWARD—HOW ESTIMATED.
    The elements which enter into the estimate in fixing the amount of compensation for a salvage service are: (1) The value of the property saved and of that employed in saving it; (2) the degree of peril from which the saved property is delivered; (3) the risk to which the property and persons of the salvors are exposed; (4) the severity and duration of the labor; (5) the promptness with which the services are interposed; and (6) the skill, courage, and judgment involved in the services.
3. SAME—DECREE OF DISTRICT COURT AFFIRMED.
    As in this case all of the elements which go to justify the largest allowance

are found, except that the duration of the labor was not long, and the risk to the salvors and their property, though very considerable, was not of a very extreme character, the decree of the district court awarding $64,700, or about 10 per cent. of the value of the property saved, is affirmed, with interest upon the amount of the award from the date of the decree of the district court at the rate of 6 per cent.

In Admiralty. The opinion of the district court is reported in 21 Fed. Rep. 459, and 10 Sawy. 304.

*Milton Andros,* for claimant.

*M. W. Fechheimer,* for libelants.

*C. E. S. Wood,* for intervenors, Gray and others.

SAWYER, J. At the last moment the able advocate for the claimant filed a voluminous and exhaustive printed argument in which the evidence in the entire case is examined with great analytical and critical ability. This was not, as I have been informed, furnished to either the advocate for the libelants, or the advocate for the intervenors. I should have given the opposing advocates in the case an opportunity to be further heard on the questions discussed if I had thought it necessary to a proper determination of any of the points raised in the argument. I have myself fully examined every question discussed, and I cannot but feel impressed with the care and labor bestowed upon the case, and with the fact that nothing has been omitted that legal ability and searching analysis could present. I have examined the maps and exhibits, and the testimony in the case, going over much of it several times, and I have arrived at satisfactory conclusions as to every disputed point, which I will now proceed to announce. In giving my decision, I shall follow the order laid down in the argument just referred to, which in turn has followed the order of the findings of fact in the decree made by the district judge.

"*First.* That the services performed by the libelants and intervenors to the Queen of the Pacific, her tackle, apparel, furniture, appurtenances, and cargo, on the fourth and fifth days of September, 1883, were salvage services."

This finding is admitted.

"*Second.* The diameter of the wheel of the Queen of the Pacific is sixteen feet, the hub of her propeller is three feet in diameter, and the center of the hub is nine feet above the keel line."

This finding is admitted.

"*Third.* At low water the hub of the propeller, when not covered by the swell, was clearly visible, and there was not more than eight feet of water under the stern of the stranded vessel at low tide when she was aground."

This is the first finding challenged. I shall not go into the evidence upon this head. I have carefully examined it, and I am satisfied that the finding is fully sustained by it. To Capt. Harris' testimony bearing upon this point I attach considerable weight. He is a man of experience, master of the government life-saving station at Cape Disappointment, totally disinterested, and he had good oppor-

tunities to observe the condition of things at the time. I think the finding is fully borne out by the testimony, and I affirm it.

"*Fourth.* That the vessel and her cargo were in imminent peril of destruction at the time the services were rendered, and that said vessel and her cargo would probably never have been saved without the aid furnished by libelants and intervenors."

This finding is also challenged, and is examined in the claimant's brief under the following heads:

"(1) Whether the vessel was in *imminent* peril of destruction at the time the services were rendered; (2) whether it be probable that the ship and her cargo would never have been saved but for the aid furnished (a) by the libelants, (b) by the intervenors; (3) if it be probable that without the aid of the libelants and intervenors the ship would have been lost, then the degree of such probability."

This is, perhaps, the most important finding in the case, and the amount of property at stake is so large, reaching about three-quarters of a million of dollars, it must be one of the main controlling elements in fixing the amount of the award, and I have consequently given to the point what I believe to be careful and conscientious consideration. The word "imminent," it is insisted, conveys usually some idea of "immediate,"—of something to happen "upon the instant." But concede this to be so, in a general sense, yet it does not mean an instant consummation. There was peril all the time. A storm was liable to rise at any moment; and there was in fact a high wind and rough sea on the day after the rescue. That the Queen was in a position of extreme peril is admitted. That, if she had not been rescued at the time she was, in all probability she never would have been is also admitted. But we do not need these admissions. We know from the history of those sands, and the wrecks upon them, from the natural laws that govern the ocean, and from all the testimony in the case, that the situation was one of the greatest menace, calling for prompt action and constant attention, and that anything like a storm at any time would have inevitably destroyed the ship. Indeed, it might well be said that the destruction would have been inevitable had she not been got off at the time she was. Immediate, prompt, continuous, energetic action was required to save her. Therefore, I think it can be said with entire truth that the danger was "imminent" during the entire time she was on the sand. In the opinion of all the witnesses familiar with Clatsop spit, her position was one of imminent danger. Capt. Flavel's son said that he did not think she could be saved. I am also inclined to attach considerable weight to the testimony of Capt. Barry, who has been a resident for some years at Astoria, and who was then acting as the agent for the Lloyds, and whose opinion was "that unless there was a series of very fortunate circumstances and good management the Queen would not come off." All seemed to entertain similar views.

As to whether the ship would probably have been lost but for the efforts of the salvors, it is in evidence and admitted that immediately

after the steam-ship grounded the engines were reversed, and kept backing with full force for several hours without avail, and that she went on and came off at about the same stage of the tide is likewise admitted. All that the steam-ship had acquired before the libelants took hold of her in addition to her propeller was the anchor sent out during the night by means furnished by the intervenor Gray. Meanwhile, she had lain over 24 hours on the sands, and it had bedded about her, burying her propeller-blades so deeply that the engineer found great difficulty in working them past the center. To the cable attached to the anchor, which anchor was very soon deeply bedded, and never came home at all, was applied a fourfold purchase, which would multiply the power of the capstan engine four times, less friction and stiffness of cordage. I have no doubt this anchor held the ship from going further on the sands. Again, at the high tide, after midnight, with the capstan worked by an engine of 50 horse-power, with the fourfold purchase mentioned, and the main engines in full play for several hours, the tide being at its height, the ship failed to come off, or even to move. There is evidence tending to show that she moved a little; but I do not trust that evidence,—it does not satisfy my mind. It was certainly very difficult to determine, by the means employed, that the ship had moved the short distance of nine feet, as testified to by third officer Wheeler, the only officer who speaks with any degree of positiveness, but to whose evidence I do not attach much importance; for he at one time testified that she moved 540 inches, which wholly uncorroborated statement he, upon the following day, corrected and limited to 108 inches. Capt. Alexander, who, of all on the ship, ought to have known, is very careful not to say that she moved; he will only say, "It was the general impression that she moved that night." Capt. Harris, of the life-saving station, a disinterested witness, and one upon whose testimony I feel disposed to rely, says that he tied a rope yarn about the hawser, and it carried through the hawse-pipe about nine feet; but this, he said, would only indicate that the ship moved, or the anchor came home, or the hawser stretched. In another place Capt. Harris states positively that he does not think the ship moved; and, on carefully examining his testimony, I have concluded this to be his real opinion, and what he meant to indicate about the piece of twine was that the new hawser had stretched about nine feet. But, suppose she had moved, if she stopped after having moved, the stoppage must have been occasioned by some resistance greater than she had been overcoming; and to stop a ship of her size, when once in motion, with considerable momentum acquired, no trifling sand-bank would suffice; so that we might truly say the last condition of this ship was worse than the first. My own conclusion is that the ship did not move at all.

Again, it is said in behalf of the theory that the Queen accomplished her own relief, that Capt. Alexander called out to the engineer to give her all the steam she would stand, to "throw the throttle wide

open," or something of that kind, and then she came off. Now, according to the engineer's testimony, the whole machinery of the vessel had been working up to its full capacity for half an hour before she came off, so that, whatever Capt. Alexander may have intended, it is evident his words had no effect. He doubtless gave the order as the vessel rolled back and forth, and he saw she was loosened in her bed; but the critical moment had passed, and the work had been accomplished. I think it is clear from the evidence that after the four tugs of Capt. Flavel swung around to their second position (the main and the capstan engines being in full play) there was a "long pull, a strong pull, and a pull altogether," which had the happy result of releasing the ship. Whether any of these forces, and, if any, just which ones, could have been dispensed with is a matter that cannot be known; but, in my opinion, they were all necessary, and all contributed largely to release the ship, and I have no doubt at all that the vessel would never have been gotten off if it had not been for the efforts of the salvors, libelants and intervenors. I do not think the services of either the libelants or the tugs or of the intervenors could have been dispensed with without a loss of the vessel. It was, as I say, a united effort, at the right moment, after the vessel had been loosened and rolled over in her bed by the action of the libelants, that released the ship. I think this finding of the district judge is couched in very moderate language. To me it seems he would have been justified in using the stronger terms, perhaps, that but for the salvors her loss would have been inevitable. We know these facts: that after she went on she worked her engines to their utmost capacity for some hours without any effect; that again, at the next tide, she, together with the capstan engine, working at the capstan connected with the anchor, worked them all for two hours at their full capacity without effect; and again, at the following tide, after working all her engines for two hours, and for the last half hour at their full capacity, with the aid of Capt. Flavel's four tugs, and after the tide-rip had 24 hours to bank her up, she did in fact come off at a tide several inches lower than when she went on. What would have happened in the absence of any one of these aids we can only conjecture. It is true that a considerable cargo had been jettisoned, but the ship was buried still deeper in the sand in the mean time. I think it safe to conclude that she never would have been got off with any appreciably less aid than was afforded. I do not think it necessary to occupy more time in reviewing the evidence and presenting my reasons further upon this head. The finding of the district court is affirmed.

One other point I deem it proper to notice in this connection; that is, that in order to depreciate the services of Capt. Flavel and his tugs the claimant finds it necessary to give full credit to the efficiency of this anchor, carried out by the means furnished by Gray, the scow, and the tug Canby; and, in seeking to deprive Gray of his share of the reward as a salvor, the advocate for the claimant suggests means by

which the ship, without the aid afforded, could have accomplished the same purpose, but none of these means are shown by the evidence to have been used, or even otherwise suggested, and what might have been done is wholly conjectural. All that is certain is that Capt. Gray, either from experience in such matters, or by a happy inspiration of the moment, grasped the fact that the Queen had no means for carrying out her heavy anchors, and that his scow would afford a ready and certain way of approaching her, and suitable means for accomplishing this object; that he acted promptly upon the thought, brought his scow from Astoria, and that the means thus provided by him were used with great benefit to the ship; and that until the arrival of the scow the planting of an anchor had not even been discussed or suggested, so far as we know; that Capt. Gray remained by the distressed steam-ship until his services were no longer needed, and in the dark with his tug and scow assisted in carrying out this anchor,—all of which shows that he is largely, if not solely, entitled to the credit of whatever benefit this anchor was to the ship.

"*Fifth.* That the vessel went on and came off the spit where she was aground at high water 'slack.' "

This finding is not challenged.

"*Sixth.* That on the fourth of September, 1883, it was high water at the point where the vessel was aground at about 1:41 o'clock in the afternoon, and on the fifth of September, 1883, it was high water at the same point at about 2:07 in the afternoon."

This finding is not challenged.

"*Seventh.* That the main engines of the vessel are 3,000 horse-power, and she has also a smaller engine of 50 horse-power; that the highest capacity to which the main engines were ever worked during the time she was stranded was about 2,200 horse-power; and that as soon as the vessel grounded her engines were reversed and worked to their full capacity attempting to back her off, but without success; and that on the night of the 4th, at high tide, both her main and her smaller engines were worked to their full capacity for about two hours in attempting to get the vessel off, but without success."

This finding is not challenged.

"*Eighth.* That the engines of the stranded vessel had been working to their full capacity for about half an hour immediately prior to the time when the vessel came off the spit."

This finding is admitted.

"*Ninth.* That the weather during the time the vessel was stranded was thick with fog and smoke, and the sea was comparatively smooth, with a swell thereon of about six feet."

This finding is challenged, but there is no contest upon it except as to the height of the swell, and I think the majority and weight of evidence sustain the finding. It is affirmed.

"*Tenth.* That on the night of the fourth of September, 1883, and at low tide, there were light breakers or tide-rips in the vicinity of the place where the vessel was aground."

This finding is challenged, but was, as I remember it, abandoned on the trial. Certainly there is no conflict as to this point in the evidence, and the finding is affirmed.

"*Eleventh.* That on the day following the rescue of the vessel the weather and surf on the spit were such as would have made it very dangerous for the vessel if she had been there."

This finding is challenged, but exactly why I cannot understand, for the next finding, which is admitted, contains a corroboration of it. However, it is, in my opinion, fully sustained by the evidence, and is affirmed.

"*Twelfth.* That if the vessel had not been rescued when she was in all probability she never would have been saved."

This finding is not challenged, and it obviates any necessity for the three preceding findings.

"*Thirteenth.* That the libelants and intervenors displayed promptitude, energy, skill, and good judgment throughout in the performance of the services rendered to the property libeled in this suit, and that the safety of such property was largely due to the efforts of the libelants and intervenors in that behalf."

This finding is challenged, but is discussed in claimants' brief in the third subdivision of the elements of salvage, and under the fourth finding of the decree. I do not think it necessary to add anything to what I have already said, further than to remark that I think it highly probable, if not certain, that a man of the large experience of Capt. Flavel, (over 25 years at the mouth of the Columbia river, and engaged in the steam-tug business for towing and aiding vessels,) would know more about the business in hand than any other person present. At all events he was left to his own devices and discretion, and at no time was he interfered with or a suggestion made to him by those on the Queen. This shows the confidence reposed in Capt. Flavel's judgment, experience, and discretion by the officers and agents of the Queen. Some fault has been found with him for hauling with the tugs on the port quarter of the Queen of the Pacific, and with his theory of "wiggling" her in her bed, and the opinion has been expressed by some of claimants' witnesses that he ought to have pulled dead astern, so as to drag her off in the way she went on. In the first place, she was a very large and heavy ship, and must have gone onto the bank or spit under full headway, for she was found wholly inside the 12-foot depth of water line, and a long way inside the line of breakers, and no efforts of her own gave her any relief. It is evident that loose, shifting sands, of the character these are shown to be, would bank about her mid-ships, and it is in evidence that she had a considerable bank on her starboard side, and it is more than probable there was one on her port side also. These banks had accumulated under the operation of the "tide-rips" during the 24 hours and over that the Queen of the Pacific was on the spit, and it is evident that to have dragged her through them, she being wider amid-ships than

aft, would have been, in the nature of things, very difficult if not impossible. It does not need evidence to show, on the other hand, that if she could be moved ever so little in her bed it would loosen the sand about her and allow the water to rush in and help clear it away. Besides, these banks of sand closely impacked about the sides of a ship would, not only by friction and pressure hold the ship in her bed, but exclude the water and its pressure, and thus diminish largely the area of the lifting surface for the water to act upon, and the buoyant effect would be lost of a large portion of the water about her, so that it would require a greater depth to float her than if the sand were not packed about her sides. By pulling on the quarter, and endeavoring to turn the ship in her bed about her midlines, it is evident a greater force could be exerted to break up this bed of sand. Moreover, these cables, one fastened to her starboard and one to her port quarter, were attached to the ship 20 or 25 feet above her keel, thus giving this leverage to the tugs to enable them to roll her upon her keel. For example, we all know that by fastening the cables on the masts a little above the decks, and using the leverage afforded, ships are often hove down to scrape or repair their bottoms. That this proceeding produced its proper effect is evident from the fact that when the tugs had pulled for awhile the ship righted and surged over to port, but when they relaxed, and fell around more to stern, at the time they were getting into position to pull her off, she again rolled back to starboard, (thus rolling back and forth in her bed,) a conclusive proof, to my mind, that she had broken her bed of sand, but was still resting her keel upon the bottom, and was far from being afloat. Much stress is laid upon the anchor laid by the Queen by the aid of Capt. Gray, and which was attached to a cable having a fourfold purchase rigged upon it, and operated by the steam capstan. This anchor was put out and located under the directions of the officers of the Queen for the purpose of holding her, and to aid in withdrawing her from her perilous position, yet it was planted out in very nearly the same direction as that last occupied by the tugs in relation to the Queen This is conclusive evidence that the officers of the Queen at that time thought this the proper direction to pull in order to work the ship in her bed and relieve her from her perilous position, and is a practical vindication by the respondents themselves of the judgment of Capt. Flavel in pulling off the port quarter until the vessel should break up her bed of sand, and so become loosened and lifted up as to be in a position to float off by the united stern pull as afterwards applied. I will not go into this question further as to the propriety of the action of the libelants, but will say that success in fact, after repeated failures without their aid, vindicated their judgment, and that I fully concur in the finding of the district judge, which is affirmed.

"*Fourteenth.* That in the performance of the services the libelants on board the tugs, under the management of the libelant George Flavel, were exposed to considerable danger and risk, and that the tugs managed by libelant George

Flavel were in considerable danger of destruction during the performance of the services."

This finding is challenged, and is examined by the counsel for the claimant in the second subdivision of his consideration of the elements that are to be considered in determining the amount to be allowed for a salvage service. I will not attempt to give all the reasons that have led to my conclusion on this point. The finding, and the language in which it is expressed, commend themselves to my approval upon the evidence. The risk or danger may not have been and was not of the most extraordinary character, but it certainly was of such a character as to be worthy of great consideration. It was considerably greater than that of an ordinary towage service. If there was no other evidence, it would be sufficient to note that fears for the safety of the tugs were expressed by those on board the Queen; and, though the weather and the sea were not of the most dangerous character at the time, still the safety of those on board the tugs was identified with that of the tugs themselves, and in such a scene what would have been the result of any accident must remain largely a matter of conjecture. We know from general experience that on such occasions there is always more or less danger. The fact that Capt. Flavel, in response to expressions of fear on the part of some of the crew, said, in tones manifesting some degree of passion, "Stay here; you can't drown, anyhow," is dwelt upon by the advocate for the claimants as showing *his* (Flavel's) estimate of the danger to be slight; but, taking the evidence altogether, I think the more reasonable view is that there must have been considerable danger when Capt. Flavel found it necessary to quiet the apprehensions of experienced seamen by such a decided command. However that may be, it is not important, for it is plain that the tugs could not have been damaged to the extent they were—over $3,000 being allowed, and admitted to be just, for repairs to the tugs—if something more than ordinary risk had not been incurred. The damages allowed to the tug least injured were more than $500 dollars. Again, the risk of grounding, some of them having thumped on the bottom, and of loss of one or more of the tugs, was not an ordinary risk; and, as before remarked, the safety of the crew was in a measure identified with that of the tugs they were on. I consider the finding a very proper one, and affirm it.

"*Fifteenth.* That no contract was made or entered into between the libelants and claimant in relation to the services so rendered by libelants as to the compensation to be paid or received therefor, and that the value of such services should be determined under the general admiralty law."

This finding is admitted.

"*Sixteenth.* That the bills presented by the intervenor Gray to George C. Perkins, and paid, were presented and paid under the apprehension that the libelant George Flavel would settle his demands on the basis of services rather than of salvage, and with the understanding that if it should prove otherwise, and legal proceedings for salvage should be instituted, then the rights of the intervenor should not be prejudiced by such settlement."

This finding is challenged, but I find the evidence of Capt. Gray to be very clear, direct, and positive upon the point, and in comparing it with that of Gov. Perkins I see no reason to disbelieve it. Gov. Perkins admits some such conversation, and so confirms Gray, but places a somewhat different construction upon it. But his memory is not so decided nor so clear as Capt. Gray's, and, as I have said, I can see no reason to doubt the latter; but if there were any doubt upon the question, the testimony of Mr. Noyes, a disinterested witness, that Gov. Perkins afterwards said that Gray ought to share if the others received salvage, or remarks to that effect, would resolve it in favor of Gray. This finding will be affirmed with the exception of the word "apprehension." Apprehension conveys some idea of fear. I think the word "expectation" more nearly represents the state of facts disclosed by the evidence. With this alteration the finding of the court below is affirmed.

"*Seventeenth.* That the value of the property saved is as follows: The Queen of the Pacific, $485,000; her cargo, $220,000; express matter, $22,750; passenger fares, $3,124.56; freight earned, $5,912.28; making in all the sum of $736,786.84."

This finding is admitted.

"*Eighteenth.* That the amount of cargo jettisoned was about 632 measurement tons, valued at about $95,000."

This finding is admitted.

"*Nineteenth.* That the value of the property employed in performing the salvage services aforesaid was as follows: By the libelants, $100,000; by the intervenors, Gray *et al.*, $50,000; making in all the sum of $150,000."

This finding was challenged, but the objection was abandoned on the trial, and the finding is considered admitted. I only care to remark upon this, as an element in determining a salvage award, that it is a considerable amount of property for salvors to put at risk. It is about one-fifth the value of all the property saved, which, as I have said, was itself an extraordinary amount; and the value of the property engaged in the salvage services is an important element in determining the amount to be awarded.

"*Twentieth.* That the expenses incurred by the libelant George Flavel in and about the performance of the salvage services were as follows: For repairs to the tug Brenham, $820; to the tug Columbia, $1,120; to the tug Astoria, $560; to the tug Pioneer, $700; in all the sum of $3,200."

This finding is admitted.

"*Twenty-first.* That neither of the libelants nor the intervenors would have been entitled to any compensation if the property had not been saved."

This finding is challenged, but upon what ground I am ignorant. The point has not been argued before me. The finding is affirmed.

"*Twenty-second.* That the libelants and intervenors are entitled, according to the rule of the admiralty law, to the sum of $54,700, as compensation for the services rendered by them, which sum should be distributed among them as follows:" [Here follows the distribution made by the district judge.]

This award is, of course, the great issue, and the only ultimate issue, contested on the appeal in the case, to the determination of which all other findings tend, and the remarks already made in considering them render any further discussion of the elements of the salvage service unnecessary. It simply remains now to determine whether this award is disproportionate to the services rendered. In arriving at a conclusion the whole case must be taken into view. The award is $64,700 in all. It is liberal, but the case demands that it should be so. It would have failed to satisfy the rules and theories of admiralty law if it had not been liberal. The permanent interests of commerce and of the public, as well as of the underwriters and owners themselves, demanded that the award should be liberal. The elements which enter into the estimate in fixing the amount of compensation for a salvage service are: (1) The value of the property saved and of that employed in saving it. (2) The degree of peril from which the saved property is delivered. (3) The risk to which the property and persons of the salvors are exposed. (4) The severity and duration of the labor. (5) The promptness with which the services are interposed; and (6) the skill, courage, and judgment involved in the services. In this case all the elements which go to justify the largest allowance are found, except that the duration of the labor was not long, and the risk or danger to the salvors and their property, though very considerable, was not of a very extreme character. It is seldom that so many of these elements are found in the same case. The peril of the property saved was very great. The destruction of the vessel seemed almost inevitable. The amount saved was large, as was the value of the property employed in saving it. The service was promptly rendered, and a high degree of skill, courage, and judgment displayed. The amount of property rescued from almost inevitable destruction is very large indeed,—about three-quarters of a million of dollars. The risk to life and property of the salvors, while not of the highest degree, was well deserving consideration. The circumstances, therefore, demanded a liberal allowance, and as I have before said, the award is liberal, but I am not prepared to say that it is too liberal. On the contrary, taking the whole case into consideration, I am satisfied it is no more than true policy and justice require. The allowance is only about 10 per cent. upon the value of the property saved. While the sum in the aggregate is large, the percentage upon the value is not so. The distribution of the award I shall not go into. The district judge had the parties and the witnesses before him, and I am satisfied that he considered well the distribution he made. It is satisfactory to me, and there is no complaint on the part of those claiming the salvage moneys allowed. The finding is affirmed.

There are certain other intervenors in the case, though how they get here is a question. On looking at the records I find they never filed any stipulation for costs in the district court, either upon filing their intervention, or at any other time, and the only way they appear

before me is by this notice of appeal. No one appeared for them in court at the oral argument, and I only found out that they were making any contest here by accidentally discovering a short statement of their points among the papers. Their cause was considered abandoned in the district court, and their intervention was ordered dismissed. I affirm that decision.

The decree of the district court in this cause is affirmed.

I have concluded to allow 6 per cent. interest—maritime interest—upon the amount of the award from the date of the decree in the district court. Counsel, in preparing the findings and decree of this court, will conform to those of the district court in all respects, except in the particular I have mentioned relative to the conditional settlement with Capt. Gray. For the word "apprehension" will be substituted the words "under the expectation and upon the hypothesis."