No. 25,604.

Theresa Smith, *Appellee*, v. The City Ice and Delivery Company, *Appellant.*

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Untied Team Negligently Left on Street—Deceased Killed While Attempting to Stop Runaway Team—No Contributory Negligence Shown.* In an action for the death of the plaintiff's husband while attempting to stop a runaway team of the defendant which had been negligently left untied, the evidence is held to justify a finding that there was at the time such imminent danger to human life or limb from the runaways as to free the decedent from the charge of contributory negligence.

2. SAME—*Asignments of Error Do Not Require a Reversal.* Various rulings which are complained of are held not to require a reversal.

Appeal from Sedgwick district court, division No. 3; Jesse D. Wall, judge. Opinion filed January 10, 1925. Affirmed.

*C. G. Yankey, W. E. Holmes, D. W. Eaton,* and *John L. Gleason,* all of Wichita, for the appellant.

*John W. Adams, William J. Wertz,* and *George L. Adams,* all of Wichita, for the appellee.

The opinion of the court was delivered by

Mason, J.: A little before noon a team of mules attached to an ice wagon of the City Ice and Delivery Company of Wichita were left in the street untied while the driver went into a restaurant for lunch. They ran away, and John Smith received fatal injuries in an attempt to stop them. His widow brought this action against the company, recovering a judgment for $10,000, from which it appeals.

1. The law treats the voluntary risking of one's own life as negligence *per se* if the purpose is merely to protect property, but not if it is to save human life. Here a reversal is asked principally upon the contention that the decedent was conclusively shown to have been guilty of contributory negligence, inasmuch as there was no evidence tending to show that any person was placed in peril by the runaways at the time the decedent attempted to stop them; that although they had entered a street intersection while a number of school children on their way home were on the further corners, they turned into the cross street and passed the children before the decedent's attempt to stop them, and that neither these children nor any one else was in danger at that time.

The defendant relies largely upon *Devine v. Pfaelzer*, 277 Ill. 255, annotated in L. R. A. 1917 C 1080. There one who lost his life in an attempt to stop a runaway horse drawing a buggy was held guilty of contributory negligence as a matter of law because the occurrence took place in a residence district, on a street which no one testified was a busy one, there being no testimony, nor any circumstance that might raise an inference, that there was anyone in the roadway or that any person was in the slightest danger from the horse, and no evidence from which it could be presumed what was in the mind of the person killed or that he had any occasion to believe anyone to be in danger. Even in that situation two justices dissented. The court said, however, that to defeat a plea of contributory negligence by showing an act to have been done to preserve life "it is not essential . . . that the effort should be to save the life of some particular and definite person" (p. 260), citing *Halloran v. City of New York*, 153 N. Y. Supp. 447, which it referred to as a case "where a team of horses was running away, dragging a street sweeper, in what the court called in one place a busy street and in another a measurably busy street, although the danger was not at the moment imminent to a definite person," and which it distinguished by saying: "St. Lawrence avenue was a residence street, and bore no resemblance to the busy street in Brooklyn where the team was running away with the street sweeper." (p. 261.)

Here there was evidence tending to show these facts: The street (Waterman) on which the runaway began is parallel to and four blocks south of Douglas avenue, the principal street of the city. After the mules had run west nearly two blocks they turned north into South Topeka avenue and were stopped near the next crossing, of which a witness said, "There are cars and people passing every

minute, that corner." In the first block of the street into which the mules turned all the houses except one—an automobile agency—were residences. In the two blocks north of that there were business houses. "There was quite a bit of traffic on Topeka avenue . . . south to Waterman street about the noon hour." "There was lots of people on the street at the time these mules was running there. . . . There were people in all directions." There were cars parked along South Topeka avenue north of Waterman street. "The street was just lined through there with cars parked along the curb." "There were cars parked in the street, but they were not parked so much on one side as the other, or this wagon could not have gotten down this side of the street without hitting cars." The ice wagon swung from one side to the other. "One mule would pull on the chain and swing the wagon that way, and the other mule's chain would tighten and jerk it back and keep whipping it back and forth." When the mules turned north "there were cars on Topeka avenue and a few people walking along." There were automobiles with people in them coming south on that street less than a block away. Asked, "Did you see people up along Topeka avenue afoot—pedestrians on the street?" a witness answered, "I did; yes, sir."

The difference between the Devine-Pfaelzer case and this upon the vital matter of the amount of traffic at the place of the accident is too obvious to require comment. Here the jury could have had no difficulty in saying that the street was not only "measurably" busy but quite busy, or busy without any qualifying adjective. The evidence already referred to was sufficient to take the case to the jury, even if the fact of a number of school children having been at the west corners of the intersection of Waterman and South Topeka were to be wholly ignored. The driver of the mules fixed the time of the runaway at twenty minutes before noon. The principal of a school a block south and a block west of the intersection referred to testified that the first grade of the primary department, consisting of about seventy pupils of an average age of seven or eight years, were dismissed at 11:30. The decedent at the time the mules started to run was in a motor truck going south on the first street east of South Topeka avenue, about to enter the intersection with Waterman street. There was evidence to this effect: The mules passed in front of the truck, the driver of which turned and followed them on their left side, overtaking but not passing them. The truck and the mules turned north together on South Topeka. Right at the corner the decedent jumped out of the truck, ran around behind the ice

wagon, caught up with the mules, and in attempting to stop them reached for the lines or a bridle and was knocked down and run over. Just before getting off the truck he said, "Let's stop them wild mules before they get into these kids." When he grabbed at the team there were children around there, some going north and some east. "There was a bunch of children standing there, right there near the place where these mules was caught, where Smith caught the mules, where he tried to catch them, and some of them were in the street and they were dazed and did not know which way to go, and finally they did come across and some stood on that side and some on this side, on the west side of Topeka and on the east side of Topeka. I mean by that, some had already made it across and some were trying to get across and went back." Asked if the team was then running away from the school children a witness answered: "No, it was running at them, but all the truck done to the mules it kind of turned them." In a somewhat similar situation it has been said: ·

"The same rule must be applied where the injury likely to be inflicted will be serious, even though it does not clearly appear that death would necessarily result. . . . In the present case the deceased left the blacksmith shop and attempted to stop the horse. It does not appear that any extreme danger to his own person was apparent in what he did. The emergency requiring action was sudden and there was little opportunity for deliberation. It does not appear that when he caught the rein he ran risk of serious injury, and it was only when he pulled on the line which he secured that the horse swerved and he was brought in contact with the truck. It certainly would not be permissible under such conditions for the court to characterize the act as rash and reckless, or such an act as would not be done by a person reasonably prudent. On the contrary, we think that, measuring all he did as disclosed by the evidence and surrounding circumstances, the jury were right in concluding that he was guilty of no negligence, but did what a reasonably prudent man would have done under the same circumstances, and it is fair to say it might safely be done without injury to the person many times. It was not a case where nice distinctions could be made as to the position of the truck, the speed of the horse, and the danger which confronted, unless he was stopped." (*Manthey v. Rauenbuehler,* 75 N. Y. Supp. 714, 716.)

A runaway team drawing a heavy wagon through a busy street over which people are walking and along and across which automobiles are being driven is reasonably to be regarded as a menace to human life and limb. There was direct evidence that the decedent began his active exertions while the school children at the corner of the street were in actual peril. Assuming that before the accident to himself the truck had interposed a barrier between

them and the danger, it would be an unjustifiable refinement to hold him guilty of contributory negligence because he did not discover this fact and desist from further effort to stop the team.

In a recent elaborate note on the general subject (where the runaway cases are grouped on pages 28 to 30) the conditions under which one may voluntarily risk his life without being guilty of negligence as a matter of law are thus stated:

"The rule is well settled that one who sees a person in imminent and serious peril through the negligence of another cannot be charged with contributory negligence, as a matter of law, in risking his own life, or serious injury, in attempting to effect a rescue, provided the attempt is not recklessly or rashly made. . . .

"In order to justify one in risking his life or serious injury in rescuing another person from danger, the danger threatened to the latter must be imminent and real and not merely imaginary or speculative." (19 A. L. R. 5, 10.)

The defendant urges that there is no evidence of anyone having been in imminent peril from the runaway. We regard it as a fair question for the jury whether under the showing already outlined there was not real and imminent danger that unless the mules were stopped some one would be seriously hurt or killed. The word imminent carries the idea of closeness in point of time, but does not necessarily imply the absence of any interval whatever. There is some latitude in its application according to the situation presented. An armed invasion may be spoken of as imminent although its consummation must be a matter of days. In a salvage case, the question being as to the character of the peril in which a rescued steamship had been, it was said:

"The word 'imminent,' it is insisted, conveys usually some idea of 'immediate'—of something to happen 'upon the instant.' But concede this to be so, in a general sense, yet it does not mean an instant consummation." (*The Queen of the Pacific,* 25 Fed. 610, 612. See, also, 31 C. J. 251.)

2. Several instructions were given to the effect that the plaintiff could not recover unless some person or persons had been in imminent danger from the runaway. In another instruction the jury were told in substance that the decedent was not negligent if it appeared to him that lives were in danger. The defendant contends that the latter instruction was inconsistent with the others and was erroneous. It may fairly be presumed that the jury did not regard this instruction as doing away with the burden resting on the plaintiff, repeatedly pointed out elsewhere in the charge, of prov-

ing that some one had actually been in imminent danger, but rather as adding to that burden another—that of showing the decedent to have been cognizant of the fact. That the jury took this view appears from their having found specifically that such danger was imminent and that the decedent had good reason to believe in its existence. These findings show that no prejudice could have resulted from the instruction complained of. Findings were also made that the team had not gone fifty or seventy-five feet north of Waterman street when the decedent caught hold of them or the harness; that there were then persons ("men [or man] and children") on Topeka avenue ahead of the team at various places in the first and second block; that school children near the intersection of Waterman and Topeka streets were in imminent danger at the time of the injury to the decedent; that the team had been slowed to approximately four miles an hour; that the decedent did not have time to deliberate before attempting to stop the team. Some of these findings are made the basis of criticism, but we do not regard any of them as without support in the evidence or as inconsistent with the judgment. If the words used by the jury in the finding above placed in parenthesis were "man and children" the form was doubtless suggested by that of the question as prepared by the defendant, " . . . State who such person or persons were (whether man, woman or child)?"

Complaint is made of a refusal to discharge the panel because the plaintiff's attorney asked a juryman on his *voir dire* if he was interested in any accident insurance company or carried accident insurance. So far as shown the situation was one in which the ruling of the trial court is final. (*Howard v. Motor Co.*, 106 Kan. 775, 190 Pac. 11.)

The judgment is affirmed.